```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
```

------------------------------------------------------

| | : | |
|---|---|---|
| CHARLES E. AUSTIN, *et al.*, | : | CASE NO. 4:01-CV-00071 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | OPINION & ORDER |
| | : | [Resolving Docs. No. 763, 764, 773, 774, 777, 778, 807, 813.] |
| REGINALD A. WILKINSON, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

This Opinion and Order resolves opposing motions regarding the Court's ongoing jurisdiction in this case. The Plaintiffs move for an order extending the jurisdiction of this Court for another year due to the Defendants' alleged current and ongoing violations of the Plaintiffs' federal constitutional rights. [Docs. 763, 774, 777, 813.] The Defendants move to terminate the prospective relief provided by this Court's February 25, 2002 [Doc. 227.], March 26, 2002 [Doc. 259.] and March 21, 2006 [Doc. 659.] Orders. [Docs. 764, 773, 778, 807.] The Court heard oral arguments on the matter on January 11, 2008. [Doc. 799.]

For the following reasons, the Court **DENIES** the Plaintiffs' motion to extend the jurisdiction of the Court over this case for another year and **GRANTS** the Defendants' motion to terminate the prospective relief provided by the Court's previous orders.

**I. Background**

Case No. 4:01-CV-00071
Gwin, J.

The Court notes that it has recorded this case's extensive background in its Opinions and Orders of March 21, 2006, August 2, 2006, August 7, 2006, September 27, 2007, October 18, 2007, and January 10, 2008. [Docs. 659, 699, 703, 765, 772, 798.] The Court refers the reader to these opinions and incorporates these previously discussed findings here.

Most recently, the Court has addressed the Plaintiffs' challenges to the Defendants' proposed prison policies affecting placement, classification and retention at the Ohio State Penitentiary ("OSP") as well as the Defendants' mental health policies and practices. [Docs. 765, 772.] With its September 27, 2007 Opinion and Order, the Court found that the Defendants continued to violate the Plaintiffs' procedural due process rights in certain respects and ordered the Defendants to accordingly modify their prison administration policies to conform to the requirements of the Due Process Clause. [Doc. 765.] The Defendants appealed this Order on October 26, 2007. [Doc. 775.] The Court denied the Defendants' request for a stay pending appeal. [Doc. 798.] Most importantly, on November 5, 2007, the Defendants modified their prison administrative policies to comply with the Court's September 27, 2007 Order. [Doc. 778-2.] Since the Defendants' November modifications, the Plaintiffs have not provided any further argument or evidence showing that the Defendants continue to engage in the procedural due process violations described in the Court's September 27, 2007 Order. As to the Plaintiffs' renewed mental health challenge, with its October 18, 2007 Order, the Court denied the Plaintiffs' motion to reopen their mental health claims. [Doc. 772.]

With the instant motions, the parties disagree as to whether the Court should continue or terminate the prospective relief it provided with its previous orders. [Docs. 763, 764, 773, 774, 777, 778, 807, 813.] The Plaintiffs offer three grounds in support of their argument to continue

Case No. 4:01-CV-00071
Gwin, J.

jurisdiction. First, the Plaintiffs claim that the Court's September 27, 2007 Order (finding three due process violations) confirms that the Defendants are engaging in current and ongoing violations of the Plaintiffs' constitutional rights. [Doc. 777 at 3-5.] Second, the Plaintiffs raise concerns as to the Defendants' failure to provide a statewide Level 4 policy and allegations of "serious new incidents" involving Level 4 inmates throughout Ohio. [Doc. 763 at 5-12.] Finally, they claim that the Court should retain jurisdiction to consider granting a permanent injunction regarding alleged due process violations of death row inmates at the OSP. [Doc. 777 at 5.]

On the other hand, the Defendants move to terminate the prospective relief the Court provided with its February 25, 2002 [Doc. 227.], March 26, 2002 [Doc. 259.] and March 21, 2006 [Doc. 659.] Orders. [Doc. 764.] In response to the Plaintiffs' first claim, the Defendants argue that because the Warden has complied with the Court's September 27, 2007 Order by appropriately modifying the prison administration policies, the Plaintiffs fail to show that the Defendants are engaging in current and ongoing constitutional violations that would permit the Court to continue relief. [Doc. 778, 807.] In answering the Plaintiffs' second claim, the Defendants state that the Plaintiffs' concerns regarding a statewide Level 4 policy are misplaced because the scope of this litigation and its relief is limited to the OSP. [Doc. 773 at 4.] Finally, in response to the Plaintiffs' death row claim, the Defendants say that the Plaintiffs' allegations regarding death row also fail to prove a current and ongoing constitutional violation. [Doc. 773 at 7-11.]

## II. Legal Standard

The Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, provides the standard for continuation and termination of injunctive relief in prison litigation. It provides:

> In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener--
>
> (i) 2 years after the date the court granted or approved the prospective relief; [or]
>
> (ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph . . .

§ 3626(b)(1)(A). A Court may continue prospective relief beyond two years only if the Court finds that such relief "remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." § 3626(b)(3). "The legislative history of the enactment . . . clearly shows that Congress intended 'current and ongoing' to mean a presently existing violation, not a potential, or even likely, future violation." *Cason v. Seckinger*, 231 F.3d 777, 783-84 (11th Cir. 2001). *See also e.g.*, *SCI-Graterford v. Beard*, 334 F.3d 301, 304-5 (3rd Cir. 2003).

In the instant case, the Defendants move to terminate the prospective relief found in the Court's February 25, 2002 [Doc. 227.] and March 26, 2002 [Doc. 259.] Orders as well as the Court's March 21, 2006 Order [Doc. 659.]. *See* [Docs. 764, 773, 778, 807.]. Those orders denied the Defendants' previous requests to terminate prospective relief.

Under the PLRA, the Court must determine whether the Defendants are engaging in current and ongoing violations of the Plaintiffs' federal rights such that the Court should continue the prospective relief it has provided with its previous orders. If the Court finds no such violations, the Court must terminate the prospective relief.

### III. Discussion

The Plaintiffs argue that the Court should continue the prospective relief and retain

Case No. 4:01-CV-00071
Gwin, J.

jurisdiction over this case on the following three grounds: 1) the Court's September 27, 2007 Order finding constitutional violations confirms that the Defendants are engaging in current and ongoing violations of the Plaintiffs' due process rights; 2) the Defendants' failure to provide a statewide Level 4 classification policy and allegations of "serious new incidents" involving Level 4 inmates at other prisons prove current and ongoing constitutional violations at the hands of the Defendants; and 3) the Court should consider whether the conditions on death row at the OSP constitute an atypical and significant hardship such that the failure to provide adequate procedural safeguards with regard to placement at the OSP violates the Plaintiffs' procedural due process rights. The Court will ultimately find that the Defendants are not engaging in current and ongoing violations of the Plaintiffs' federal constitutional rights to a degree that warrants continuing prospective relief and jurisdiction in this case.

**A. Levels 4 and 5 Classification, Placement and Retention Policies at the OSP** [1]

On March 21, 2007, the Court extended its jurisdiction over the due process issues after remand from the Supreme Court in *Wilkinson v. Austin*, 545 U.S. 209 (2005) until September 21, 2007. [Doc. 746.] The Court then considered five issues relating to the classification, placement, and retention policies at the OSP that the Plaintiffs claimed violated the Constitution:

> Defendants do not provide due process when determining a prisoner's expected length of stay on Level 5 during the 30 day review after placement at OSP

---

[1] On May 16, 2007, the Defendants changed their parole policy to permit OSP inmates, at both Levels 4 and 5, to be eligible for parole. [Doc. 751.] The Defendants argue, "Due to Defendants' policy change concerning parole eligibility while confined at the OSP, a protected liberty interest might no longer exist in being confined at the OSP." [Doc. 773 at 5-6.] Because the Court finds no current and ongoing violations of the Plaintiffs' federal rights, assuming that the Plaintiffs still have a liberty interest in being placed at the OSP, the Court need not address the Defendants' argument here.

Case No. 4:01-CV-00071
Gwin, J.

In annual security level assessments after a prisoner's initial placement, Defendants do not provide meaningful review

> Defendants do not provide a reasoned decision for their security assessments
>
> Defendants do not provide due process when a recommendation to reduce a prisoner's security level is reversed
>
> Defendants' proposed policies do not provide due process protections "comparable" to New Policy 111-07 as described by the Supreme Court

[Doc. 752.]

On September 27, 2007, the Court found that the Defendants' prison administration policies generally complied with the requirements of the Due Process Clause except in three specific ways. Accordingly, the Court ordered the Defendants to modify their classification, placement and retention policies to fully conform to the requirements of the U.S. Constitution. [Doc. 765.] First, the Court ordered the Defendants to ensure compliance in the annual security level assessments:

> Based on *Wilkinson*'s emphasis on the importance of an inmate's behavior as a benchmark for the terms of his incarceration and after reviewing the "Annual supervision reviews for level 5 inmates" contained in the proposed policy, the Court finds Plaintiffs' request to be reasonable in asking that Defendants communicate in sufficient detail their consideration of an inmate's positive behavior at the OSP to the inmate at the time of the annual security review. To do otherwise would provide notice, but no content and, as such, run the risk of falling short of the Constitution's adequacy requirement.
> Thus, the Court orders Defendants to consider and communicate in sufficient detail inmates' positive behavior during the annual review process.

*Id.* at 9. Second, the Court ordered the Defendants to provide reasoned decisions to the Plaintiffs in their security assessments:

> The Court agrees with Plaintiffs that these notices do not provide inmates with a reasoned decision that gives them notice as to what they must do to reduce their status from Level 5. Indeed, these notices tell inmates that, regardless of their good behavior and self-improvement, they can expect to "remain[] confined at the OSP for many years."
> This message runs counter to the Supreme Court's jurisprudence and this

Case No. 4:01-CV-00071
Gwin, J.

> Court's previous Orders. . . . Thus, the Proposed Policy and the OSP's procedures in implementing them must provide for a reasoned decision[] to an inmate as to what he must do to reduce his classification status from Level 5.

*Id.* at 11-12.[2/] Finally, the Court ordered the Defendants to provide notice to Level 4 inmates of their rights regarding voluntary placement at the OSP:

> In order for the inmates to knowingly and voluntarily choose to remain at the OSP and thereby waive certain rights, they must "have full awareness of the consequences" of remaining at the OSP and the three elements Plaintiff lists above.[3/] The Court orders Defendants to so revise the election form.

*Id.* at 23.

Effective November 5, 2007, the Defendants modified their prison administration policies to conform to the three orders above. [Doc. 778-2.] As to the first order, the Defendants' Level 5 Classification policy now states, "The Classification Committee must consider and communicate in sufficient detail inmates' positive behavior during the annual review process." *Id.* at 11. As to the second order, the policy now provides, "The Classification Committee must provide a reasoned decision to an inmate that tells what he or she must do to reduce his or her classification status from Level 5." *Id.* Finally, as to the third order, Warden Mark Houk states, "In response to the Order, all inmates classified as Level 4 have executed a revised election form . . . . I directed my staff to submit the revised forms to my administrative assistant on October 30, 2007, which was accomplished." *Id.* at 1. The Defendants submitted the revised election form to the Court. *Id.* at 2.

---

[2/] The Court also points to its January 10, 2008 Order that further elaborated on the scope of this second Order. [Doc. 798 at 5-11.]

[3/] Level 4 prisoners must have notice of the following three elements: "(i) that [the Level 4 prisoner] shall not be placed or retained at OSP without his written consent, (ii) that he can withdraw his consent in writing at any time, and (iii) that the Bureau of Classification will transfer him to another institution with all due speed upon receipt of a valid request for transfer." [Doc. 765 at 19 (citing Doc. 716 at 14).]

Case No. 4:01-CV-00071
Gwin, J.

With these revised policies and forms in place and without any further evidence that the Defendants are failing to comply with the Court's September 27, 2007 Order,[4/] the Court finds that the Defendants have complied with the Court's September 27, 2007 Order. Therefore, the Court does not find that the Defendants are committing current and ongoing constitutional violations as to their Levels 4 and 5 classification, placement and retention policies at the OSP.

At oral argument, the Plaintiffs recasted this inquiry into a mootness-voluntary cessation determination. [Doc. 803 at 17-18.] The Plaintiffs claimed that the Defendants are in effect saying that the Plaintiffs' claims are moot because the Defendants voluntarily ceased committing violations by modifying their policy. The Plaintiffs say that the claims are only moot, and implying that the Court can only terminate jurisdiction, if the Court finds that there is no reasonable expectation of the violations recurring. *See Friends of the Earth v. Laidlaw, 528 U.S. 167, 189 (2000)* ("the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur'") (citation omitted). However, under the PLRA, this Court cannot continue prospective relief at this juncture without finding a *current and ongoing* violation of the Plaintiffs' federal rights. *See e.g.*, *Cason, 231 F.3d at 783-84*; *SCI-Graterford, 334 F.3d at 304-5*. The likely recurrence of a violation is not enough to meet the PLRA standard needed to continue jurisdiction. The PLRA's legislative history provides guidance:

> These dual requirements [of current and ongoing] are necessary to ensure that court orders do not remain in place on the basis of a claim that a current condition that

---

[4/] The Court does not consider the Plaintiffs' vague footnote reference to some unresolved issues between the parties as additional argument or evidence supporting the extension of jurisdiction. [Doc. 813 at 7, fn. 2.]

Case No. 4:01-CV-00071
Gwin, J.

>does not violate prisoners' Federal rights nevertheless requires a court decree to address it, because the condition is somehow traceable to a prior policy that did violate Federal rights, or that government officials are "poised" to resume a prior violation of federal rights. If an unlawful practice resumes or if a prisoner is in imminent danger of a constitutional violation, the prisoner has prompt and complete remedies through a new action filed in State or Federal court and preliminary injunctive relief.

*SCI-Graterford,* 334 F.3d at 304-5 (quoting H.R. Conf. Rep. No. 105-405, at 133 (1997)).

Without finding a current and ongoing violation of the Plaintiffs' federal rights, the Court cannot continue prospective relief on this ground.

**B. Level 4 Classification, Placement and Retention Procedures at Ohio Prisons other than the OSP**

The Plaintiffs raise similar constitutional concerns regarding Level 4 procedures at other prisons throughout Ohio.[5] [Doc. 763 at 5-12; Doc. 777 at 10-11.] The Plaintiffs say that the Defendants' lack of a statewide Level 4 policy and "serious new incidents" involving Level 4 inmates at other prisons present current and ongoing constitutional violations such that the Court must retain jurisdiction and continue prospective relief in this case.

The Court agrees with the Defendants that this argument is misplaced. While the Plaintiffs' allegations may have merit, this case does not involve the procedures used to classify inmates at institutions other than the OSP. The scope of the Plaintiffs' First Amended Complaint is limited to allegations involving the OSP. [Doc. 20.] As the Supreme Court said when it described the scope

---

[5] The Plaintiffs say that "in September 2007, there is still no stand-alone Level 4 policy." [Doc. 763 at 7.] The Court notes that the Defendants provided the Court with their proposed "Inmate Security Classification Level 4 at the OSP" policy on February 27, 2007. *See* Doc. 738. Because the Plaintiffs have not presented any further challenges to the Defendants' proposed policy governing Level 4 at the OSP following the Court's September 27, 2007 Order, the Court does not review this policy but instead addresses what it takes to be the Plaintiffs' primary concern--the lack of a statewide Level 4 policy governing procedures at prisons other than the OSP.

Case No. 4:01-CV-00071
Gwin, J.

of its review in *Wilkinson*, the case involves "what process an inmate must be afforded under the Due Process Clause when he is considered for placement *at OSP*." *Wilkinson*, 545 U.S. at 220 (emphasis added). As described above, the Court has addressed and the Defendants have appropriately responded to the Plaintiffs' concerns regarding Level 4 prisoners at the OSP. The Plaintiffs' current claims involving prisons other than the OSP are not properly before this Court.[6/]

**C. Death Row at the OSP**

On October 3, 2005, the Court denied the Plaintiffs' motion seeking a preliminary injunction preventing the transfer of death row inmates from Mansfield Correctional Institute ("ManCI") to the OSP. [Doc. 624.] The Plaintiffs had argued that the transfer of death row inmates to the OSP without individualized hearings would deprive them of liberty without due process of law. *Id.* The Court responded: "[T]he Court finds insufficient evidence that confinement of death row inmates under the conditions promised by Defendants would be atypical and a significant hardship," and therefore the Court found no liberty interest entitled to due process protection. *Id.* Because the death row inmates had not yet been transferred and the Court based its decision on the representations of the Defendants, the Court reserved ruling on the Plaintiffs' request for a permanent injunction "until such time as the Court may better evaluate the actual restrictions placed on and privileges afforded death row inmates at OSP." *Id.* at 20.

---

[6/] The Plaintiffs suggest that these claims are appropriately addressed to this Court because they involve prisoners who, though no longer at the OSP, are class members of this lawsuit. [Doc. 763 at 8; Doc. 777 at 10.] While the Plaintiffs are correct that the class includes prisoners who were one time at OSP and are no longer there, the Plaintiffs are incorrect that the scope of this lawsuit includes prison administration policies and practices throughout the state of Ohio. As the Court described in its October 5, 2001 Order certifying the class, "The Plaintiffs' claims are based on the alleged cruel conditions at OSP." [Doc. 105 at 9.]

The Plaintiffs now say they "need an opportunity to contest genuine issues of material fact before the Court comes to conclusions" on whether the conditions on death row at the OSP create an atypical and significant hardship such that inmates have a protected liberty interest in being placed there. [Doc. 777 at 5.] With their reply brief, the Plaintiffs request that the Court "maintain the status quo by deferring its assessment of Death Row at OSP until after the appeal is decided." *Id.* Because the Court finds no other grounds to continue prospective relief in this case, the Court will not continue such relief for the sole purpose of the Plaintiffs' requested future assessment.

The Court does not fully address the merits of the Plaintiffs' allegations as they have conceded that their arguments are only at a "preliminary" stage [Doc. 763 at 13.] and therefore, they have not fully presented their case on this issue. Nevertheless, for the purpose of determining whether to continue prospective relief in this case, the Court examines whether the Plaintiffs have shown a current and ongoing violation of the Plaintiffs' rights on this ground. Thus, the Court addresses the Plaintiffs' preliminary arguments in this context and ultimately finds that the Plaintiffs fail to show a current and ongoing violation here as well.

The Fourteenth Amendment to the United States Constitution prohibits governments from depriving individuals of "life, liberty, or property" without "due process of law." Under 42 U.S.C. §1983, individuals may seek redress in federal court for an alleged violation of this right to liberty. Where, as here, a party seeks relief from an alleged deprivation of a liberty interest without due process, the Court analyzes the claim using two steps. First, the Court determines if the right at issue is a protected liberty interest. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993). If the Court finds such a liberty interest entitled to protection, it must determine whether the state afforded procedures that were

Case No. 4:01-CV-00071
Gwin, J.

constitutionally adequate. *See e.g.*, *Thompson*, 490 U.S. at 460; *Pusey*, 11 F.3d at 656.

Courts provide due process protection to a state-created liberty interest involving prison confinement when the state action creates an "atypical and significant hardship" by subjecting the prisoner to conditions significantly different from those ordinarily experienced by similarly situated inmates. *Sandin v. Conner*, 515 U.S. 472, 486 (1995). Here, the Plaintiffs argue that the conditions on death row at the OSP create an "atypical and significant hardship" triggering due process protection as to their placement there. With its comparative "atypical and significant hardship" analysis, the Court must compare the conditions on death row at the OSP to the conditions on death row at other Ohio prisons. [Doc. 624 at 12.]

In earlier phases of this litigation, this Court found, and the Sixth Circuit and Supreme Court agreed, that the conditions of confinement at the OSP were sufficiently restrictive so that a prisoner's transfer to the OSP presented an atypical and substantial hardship. *See Austin v. Wilkinson*, 372 F.3d 346 (6th Cir. 2004); *Wilkinson*, 545 U.S. at 223-24. Courts involved in this litigation have drawn attention to the "extreme isolation visited upon the inmates at OSP, the lack of any outdoor recreation, the limitations upon personal property rights and access to telephones and counsel, and finally, the ineligibility of OSP inmates for parole" when finding a protected liberty interest in avoiding assignment to OSP. *Austin*, 372 F.3d at 353; *Wilkinson*, 545 U.S. at 223-24.

The Court finds that the Plaintiffs' current allegations do not sufficiently differ from the evidence in 2005 such that the Court should come to a different conclusion. Thus, the Court finds that at this preliminary stage of fact finding on the issue, the conditions on death row at the OSP do not present an atypical and significant hardship triggering due process protection.

The Plaintiffs first point to restrictions on death row prisoners' visitation privileges when

Case No. 4:01-CV-00071
Gwin, J.

compared to Level 4A prisoners at the OSP (prisoners who the Court has found face an atypical and significant hardship in placement at the OSP). [Doc. 765 at 21.] In contrast to Level 4A prisoners, the Plaintiffs allege that the Defendants do not permit death row inmates contact visits until execution is imminent, only afford them semi-contact visits if space is available in the limited number of booths, only allow visits to last three hours, and require the inmates to wear leg irons during visits [7]. [Doc. 763 at 14-15; Doc. 777 at 9.] The Plaintiffs make no comparisons to death row visitation policies at other prisons.

The Plaintiffs next point to death row prisoners' recreation conditions at the OSP.[8] They say that unlike the larger yards and facilities available to death row inmates at other prisons, the OSP recreation areas are simply "extensions of the building with very high concrete walls and limited sunlight, fences over the top through which security staff look down, and concrete floors." [Doc. 763 at 15-16.] They further state that the death row prisoners are "confined in a constricted area within the same building with the same people for many years. Prisoners who are not in special management do not experience comparable restrictions in any other Ohio prison." *Id.* at 16.

The Plaintiffs also remind the Court that the duration of confinement in this context is until

---

[7] The Defendants contest this allegation: "Death row inmates have no restraints on while in visiting booths." [Doc. 773 at 7.] However, the Defendants' policy says otherwise: "The leg irons will remain on the Death Row inmate during the visit." [Doc. 763-13 at 3.]

[8] Unlike the Court's 2005 Order that emphasized the death row inmates' amount of out-of-cell and recreation *time*, the Plaintiffs here focus on the *quality* of the recreation facilities that the inmates face. With its 2005 Order, the Court found that the proposed 35 hours of out-of-cell time and 5 hours of outdoor recreation time each week, along with promises that inmates would eat meals together rather than in isolation, did not constitute an atypical and significant hardship when compared to other prisons' death row conditions, particularly at Mansfield. [Doc. 624 at 5-6, 14.] The Defendants claim that the death row inmates have at least as much out-of-cell and outdoor recreation time now as what was proposed in 2005. [Doc. 773 at 8.; Doc. 803 at 26.] Responding, the Plaintiffs reference Inmate Michael Benge's declaration and informal complaint to contest the Defendants' assertions regarding out-of-cell and recreation time: Benge says that while the Warden's statements reflect the official policy, they do not represent what actually occurs. [Doc. 777-4.] Again, the Plaintiffs presumably seek a future opportunity to contest this genuine issue of a material fact.

Case No. 4:01-CV-00071
Gwin, J.

execution or reversal of the sentence. *Id.* at 16. As the Court stated in its 2005 Order, "Given the nature of the plaintiffs' sentences, this period could vary significantly, but could potentially last for a decade or longer. Therefore, if the other conditions of confinement pose significant hardships, this factor would compound that hardship." [Doc. 624 at 14.]

In addition, the Plaintiffs draw attention to the Level 5 death row inmates' access to counsel at the OSP. With their briefs, they claim that the eight death row prisoners on Level 5 cannot access the attorney visiting facilities provided for other OSP death row inmates; they say that they "are not permitted contact visits with their attorneys (or investigators, psychiatrists, mitigation specialists or consultants) in an attorney visiting room with a table and chairs, a glass window and a door that closes." [Doc. 763 at 20.] They further state that prisoner-attorney phone calls, "when permitted, take place in the barber shop or medical satellite, not in one of the Death Row attorney visiting rooms." *Id.* The Defendants do not acknowledge a difference in access to counsel between Level 5 and other death row inmates and state:

> Attorney visits occur in the Death Row housing unit with two additional attorney rooms available within each housing unit. Such rooms may be used for both scheduled attorney visits and prescheduled telephone calls from attorneys. The two rooms within each housing block are private with sound-dampening panels, a drop down seal on the bottom of the door when closed, and permit face-to-face meetings.

[Doc. 773 at 8.]

With its 2005 Order, the Court expressed serious concern regarding death row inmates' access to counsel and counseled:

> As described [in 2005], the conditions predicted for meetings at OSP are certainly atypical when compared to the conditions for attorney-client meetings at either ManCI or SOCF. Given the importance of the ability of counsel to consult with their inmate clients, the lack of meeting space could be a substantial hardship. An acceptable plan would provide the inmates adequate access to counsel through both telephone and personal conference space. It would assure that attorney-client

-14-

Case No. 4:01-CV-00071
Gwin, J.

> communications are confidential and, of equal importance, that the inmates could
> have confidence in their confidentiality.

[Doc. 624 at 18-19.] Faced with only conflicting allegations without supporting evidence, the Court will not find an atypical and significant hardship here at this preliminary stage of argument; however, the Court encourages the parties to ensure compliance with its 2005 admonition. *Id.*

The Court also notes that at oral argument, the Plaintiffs appeared to retract some of their argument above and move the Court's attention to their concern regarding access to legal materials:

> We would say that, comparing OSP and Mansfield, that there are still problems with
> legal access, not so much in the nature of communication with attorneys, but access
> to legal materials, and we would like an opportunity to present to you in detail . . .

[Doc. 803 at 21.] Again, the Court will find no constitutional violation without any evidence before it on this point.

Finally, the Plaintiffs make a creative argument that the exclusion of eligible death row prisoners from the "extended privilege" block implicates their constitutional right to life in the context of clemency decisions: "Being in the extended privilege block could tip the balance at a future clemency hearing, and clemency is a life and death decision." [Doc. 763 at 16-18.] The Plaintiffs suggest that because all eligible death row inmates are not placed in the extended privilege block, thereby arguably impacting their clemency determinations, their right to life, in addition to liberty, is implicated, thereby triggering due process protection. *Id.* The Plaintiffs' initial problem is that they fail to provide convincing evidence that the extended privilege block status in fact influences the clemency determination.[9] Without such evidence, the Court need not determine how

---

[9] The only evidence Plaintiffs offer is a September 2007 American Bar Association recommendation: "Clemency decision-makers should consider an inmate's possible rehabilitation or performance of positive acts while on death row." [Doc. 777 at 7 (citing Evaluating Fairness and Accuracy in State Death Penalty Systems: The Ohio Death Penalty Assessment Report, American Bar Association, September 2007, Executive Summary at xxiv and 296, (continued...)

-15-

Case No. 4:01-CV-00071
Gwin, J.

this novel legal argument influences the analysis here.

The Court notes its concerns with the Plaintiffs' allegations, especially those involving death row inmates' access to counsel; however, at this preliminary stage in the Plaintiffs' argument, the Court cannot find that death row conditions at the OSP constitute an atypical and significant hardship warranting due process protection. Therefore, the Court does not find that the Defendants are committing current and ongoing violations of the Plaintiffs' federal rights in the context of death row at the OSP. The Court concludes again by noting that the Plaintiffs still have the opportunity to provide the future "fuller presentation" they referenced in their briefing here, but it will have to take the form of a different lawsuit. [Doc. 763 at 13.]

### III. Conclusion

For the reasons stated above, the Court **DENIES** the Plaintiffs' motion to extend jurisdiction for another year and **GRANTS** the Defendants' motion to terminate the prospective relief provided by the Court's previous orders.

IT IS SO ORDERED.

Dated: March 12, 2008          s/          *James S. Gwin*
                               JAMES S. GWIN
                               UNITED STATES DISTRICT JUDGE

---

[9]/(...continued)
Recommendation #5, available at <http://www.abanet.org/moratorium/assessmentproject/ohio/finalreport.pdf>).]